411 So.2d 1260 (1982)
Charles COCO, III, Plaintiff-Appellee,
v.
RICHLAND GENERAL CONTRACTORS, INC., et al., Defendants-Appellants.
No. 8717.
Court of Appeal of Louisiana, Third Circuit.
March 10, 1982.
Writ Denied April 30, 1982.
*1261 Trimble, Randow, Percy, Smith, Wilson & Foote, James T. Trimble, Jr., Alexandria, for defendants-appellants.
Darrel D. Ryland, Marksville, for plaintiff-appellee.
Gist, Methvin, Hughes & Munsterman, Dorwan G. Vizzier, Alexandria, for intervenor-appellee.
Before CULPEPPER, GUIDRY and STOKER, JJ.
STOKER, Judge.
This is a suit for the recovery of damages for personal injuries sustained by plaintiff-appellee, Charles Coco, III, in an automobile collision. Defendants-appellants in this suit are David J. Johnson, the driver of the truck which caused the accident; Richland General Contractors, Inc., the owner of the truck and Johnson's employer; and United States Fire Insurance Company and Aetna Insurance Company, the insurers of the Richland truck. Hartford Accident and Indemnity Company, the compensation carrier of plaintiff's employer, intervened to recover worker's compensation benefits it paid to plaintiff in the amount of $3,167.18 consisting of $1,691.42 in weekly payments and $1,484.76 in medical expenses.
The only issue before this court is whether the amount of damages awarded by the trial court is an abuse of its discretion. The defendants admitted liability at trial and the case was tried only to determine the extent of plaintiff's damages. The trial court awarded $170,000.00 to plaintiff and the defendants appeal that award.
On October 25, 1979, plaintiff was the guest passenger in an automobile owned by Entex, plaintiff's employer, when the car was struck by the Richland General Contractor's truck on Louisiana Highway 1 near Marksville in Avoyelles Parish. The driver of the Entex car was killed in that collision. Plaintiff was taken to the emergency room of Marksville General Hospital where he was treated by Dr. Richard Michel and released on the same day. Dr. Michel described plaintiff's injuries at that time as consisting of multiple abrasions of the face, right buttocks, and both legs and arms, including hematoma and abrasion of the left arm and elbow. Plaintiff complained of pain in his left arm and elbow at the hospital. When Dr. Michel examined plaintiff three days after the accident, plaintiff had improved, but he complained of pain in the lower left rib cage, back ache, and tenderness over the kidney area. Plaintiff's general condition continued to improve, but he still complained of pain in his back and left arm as of July 8, 1981, the time of the *1262 trial. Plaintiff was still under Dr. Michel's care at that time.
Numerous witnesses, including co-workers, friends, and family of the plaintiff, gave testimony with notably similar details of the change in plaintiff's personality from being outgoing, sociable, and energetic before the accident to being withdrawn, moody, and nervous after the accident.
The trial judge made the following awards for damages to the plaintiff:

1. Past Pain and Suffering $ 40,000.00
2. Future Pain and Suffering 40,000.00
3. Residual Disability Limiting
 Career Advancement 40,000.00
4. Personality Change 50,000.00
 __________
 TOTAL $ 170,000.00

Defendants alleged the following errors in the trial court's judgment:
"I. The Trial Court erred in granting $50,000.00 for plaintiff's `personality change' despite the fact that:
(a) There was no competent evidence to show a personality change in fact;
(b) There was absolutely no evidence showing any causal connection of any personality change to the accident in question.
"II. The Trial Court erred in awarding $40,000.00 for `residual disability limiting career advancement' when there was no evidence showing any such disability.
"III. The Trial Court erred in awarding $80,000.00 for past and future pain and suffering when there was no evidence to support such an award."
We will address these arguments in the order presented.

PLAINTIFF'S ALLEGED PERSONALITY CHANGE
The trial court segregated from pain and suffering, past and future, a separate item of damages which it designated as damages for "personality change". Aside from pure physical disability and pain, plaintiff showed that he experienced concomitant results in the form of depression, moroseness, frustration and fear or anxiety that he will suffer pain on engaging in certain activities and recreational pursuits and general disappointment at the condition in which he finds himself. In addition he experiences certain side affects such as sleepiness from taking medication to reduce his pain. We think the trial court erred in treating these residuals as an item of damages separate and distinct from pain and suffering. This is not to say that plaintiff should not be compensated for what he has, and may in the future suffer, in the form of these residuals. Our courts always have considered such residuals in establishing the quantum to be awarded for pain and suffering.
As a result of the trial court's error in this regard, counsel for both plaintiff and defendants have devoted considerable argument to the so-called issue of personality change. Defendants refer to certain cases in our jurisprudence dealing with traumatic neurosis or conversion neurosis.[1] This condition as we understand it is not based on physical or organic causes. Trauma of one kind or another may trigger the condition. A traumatic or conversion neurosis is one in which the latent anxieties or tension or insecurities in a person's mental life are converted into physical symptoms of pain, suffering and disability as real as if physically caused. Humphries v. Delta Fire & Casualty Company, 116 So.2d 130 (La.App. 1st Cir. 1959).
Traumatic neurosis may produce emotional disturbance including such personality manifestations as depression and discouragement and may convert a "jolly and energetic person" into a nervous, low spirited, and hopeless individual subject to crying spells. Allen v. Indemnity Insurance Co. of North America, 137 So.2d 110 (La. *1263 App.3rd Cir. 1962). However, it is well established that such a condition is a mental or psychic disorder which requires medical expertise in the psychiatric field to establish. In this case the only physician who even touched on plaintiff's post accident attitude and outlook was his treating physician, Dr. Ray Richard Michel, an expert in family medicine and surgery. Aside from the fact that Dr. Michel did not attempt to present himself as an expert in the field of psychiatry, we do not believe his testimony was meant by him to suggest that plaintiff was suffering from traumatic or conversion neurosis.
In approaching the subject of traumatic or conversion neurosis, our courts have adopted the rule that "since the symptoms of traumatic neurosis are vague, nebulous, and almost entirely subjective, the courts should exercise great caution in allowing recovery for such a condition." Devillier v. Traders & General Insurance Company, supra, Belson v. Subsurface Completion Service, supra, Jackson v. International Paper Company, 163 So.2d 362 (La.App. 3rd Cir. 1964), writ refused, 246 La. 591, 165 So.2d 484 (1964), Vezinat v. Marix, supra, and Allen v. Indemnity Insurance Company of North America, supra.
It is our conclusion that plaintiff did not establish that he suffered from traumatic neurosis.
Actually, plaintiff's counsel does not argue that plaintiff suffers from traumatic neurosis as such. Counsel relies almost exclusively on a case from this circuit affirming a trial court decision which singled out certain sequelae from a brain injury which had produced what the trial court called a "complete personality change." Litton v. Home Indemnity Co., 391 So.2d 541 (La. App. 3rd Cir. 1980). The sum of $60,000.00 was awarded in that case.
In Litton the plaintiff recovered from the physical injuries. His injury in a motorcycle accident included cerebral contusion and apparent skull fracture. He quickly recovered. Soon, however, plaintiff displayed what the trial court referred to as personality changes, mental and emotional instability, inability to follow simple instructions, memory loss, and the inability to perform any but simple tasks. Two clinical psychologists tested plaintiff. They concluded plaintiff suffered organic brain damage, that he experienced mild to moderate depression, anxiety, impulsiveness and withdrawal; they also testified that the brain damage would be apt to cause some degree of personality change and memory deficit. Lay testimony was elicited to show plaintiff Litton's pre-accident personality and how it compared with his post-accident personality.
In Litton the trial court described plaintiff's changed personality in these words:
"Whereas, the plaintiff, previous to the accident had been a healthy, energetic, outgoing and warm individual, at the trial of this case, his condition and personality was described as moody, depressed, withdrawn, irritable and incapable of doing the quality construction work that he was doing previous to the injury. The Court finds here there is great evidence of mental and emotional disability. The plaintiff cannot now follow simple instructions; he has loss of memory, and is not able to perform carpentry work, but acts now more as a helper and is assigned simpler tasks because of his incapability of doing the jobs required of highly trained and skilled carpenters."
The trial court's award of $60,000.00 in the Litton case, affirmed by this court, was clearly based on more than personality changes alone. In any event, we consider the condition of Litton, based on organic brain damage, to be entirely distinguishable from the case of plaintiff-appellee, Charles Coco, III, in this case. Coco is complaining of conditions based neither on traumatic neurosis or brain damage. Although plaintiff has not established any symptoms or damages of a traumatic neurotic nature or of a nature resulting from brain damages, he should be compensated for all his residuals in the form of pain and suffering.
At this point it is appropriate to consider what plaintiff's injuries and residuals are. Plaintiff established by a preponderance of the evidence that his depression and withdrawal *1264 resulted from the combination of periodic back pain and the effect of the potent pain-killing drugs which he took to relieve the pain. Plaintiff also established by medical as well as lay testimony that his back pain was a direct result of the accident. Dr. Michel, the first physician to examine plaintiff, diagnosed plaintiff's back pain as due to left lower back muscle sprain and retroperitoneal hemorrhage, which causes a burning pain and also causes muscles to tire easily due to the accumulation of blood in the tissue. According to Dr. Michel, Dr. Novoselsky, the urologist who checked plaintiff for possible kidney damage, concurred with Dr. Michel on the diagnosis of retroperitoneal hemorrhage. However, in his deposition, Dr. Novoselsky disagreed with that diagnosis and speculated that plaintiff might be suffering from a chronic muscle pull or a chronic myositis (muscle inflammation). Dr. Perdue, the orthopaedist to whom plaintiff was referred, diagnosed plaintiff's problem as "just a muscular injury which has set up a persistent myositis or tendonitis type condition causing his prolonged symptoms". Dr. Gamburg, an orthopaedic surgeon who examined plaintiff at defendants' request, was unable to find anything to explain plaintiff's pain except for ligamentous injuries which should have healed. However, Dr. Gamburg and the other examining physicians did not feel that plaintiff was trying to exaggerate his symptoms. Also, many lay witnesses testified that plaintiff often complained of back pain in the area plaintiff described to the physicians. Various lay witnesses testified that since the accident, plaintiff doesn't talk much, seemed nervous and worried more, and was much less active than before. Before the accident plaintiff raised vegetables in a truck garden, made extra money by repairing old air conditioners, tractors, and similar items, tied flies for fishing and repaired rods and reels, and helped with the house and yard work, but he does none of these things since the accident. He has also severely curtailed his hunting and fishing activities. Plaintiff smokes much more than before, up to four packs a day, and cannot sleep without waking up several times a night. He often comes home during work days to lie down whereas before the accident he was an energetic worker. He often complains of pain in his back.
We find that the evidence establishes that plaintiff is now moody, nervous, and restless. He displays less interest in recreational activities than he did before his accident. He has trouble sleeping. He is often idle when he used to be active and has no interest in doing things. He is not as jovial as he used to be. The fact of the matter is that plaintiff suffers pain and takes considerable medication for his pain. All of these symptoms are classic symptoms of persons who sustain injury and as a result suffer pain and disability.[2] They are compensable as elements of pain and suffering. They should be considered in the award to Mr. Coco. We think it would be misleading and therefore error, to treat them in a separate category of "personality change" for the purpose of the awarding of quantum.

DAMAGES FOR RESIDUAL DISABILITY LIMITING CAREER ADVANCEMENT
Defendants contend that there is no evidence to support the trial court's finding *1265 that plaintiff's residual disability limited his career advancement. While we do not agree that there is no such evidence, we find that the great weight of the evidence is to the contrary, and that on the basis in the record the trial court was clearly wrong in finding plaintiff's chances for career advancement had been limited.
Plaintiff was promoted to sales by his employer, Entex, one month before the accident in which he was injured. This job involves light lifting and some travel both of which plaintiff has trouble with because of residual pain in his back and left arm. However, because of the nature of his job, and through agreement with his supervisor, plaintiff can go home as often as he wishes to rest if his pain becomes too great. Entex will continue to allow plaintiff this "light duty" work indefinitely unless his condition worsens; then the company might "re-evaluate his position". At worst, plaintiff could be put on disability status and would receive 60% of his present income. Also, the further promotion of the plaintiff, should his condition remain unchanged, might depend upon the job for which he was being considered, since there are numerous jobs he could not do in his present condition.
However, all the medical testimony indicates that plaintiff's condition is temporary. The most conservative estimate, given by Dr. Michel, is that plaintiff's back should be fully recovered in two to five years, and the problem with his left elbow and forearm should subside in about two years. At the time of trial, one year and nine months had passed since the accident. During that time, plaintiff had received promotional wage increases and had experienced no loss of wages since returning to work.
Despite the weight of the evidence to the contrary, the trial court must have assumed that plaintiff's condition would remain unabated or worsen, and that plaintiff would then suffer some loss of income because of his inability to perform certain jobs which may or may not be required for his promotion. An award made on this basis would be highly speculative. It is well settled that courts cannot award speculative damages which are not proven with some detail and specificity. See Rawley v. Rawley, 357 So.2d 286 (La.App. 1st Cir. 1978), writ denied, 357 So.2d 1154 (La.1978), U.S. cert. denied, 439 U.S. 968, 99 S.Ct. 459, 58 L.Ed.2d 427; and Calecas v. Prieur, 384 So.2d 584 (La.App. 4th Cir. 1980). The burden of proving both the existence of injuries and the causal connection between them and the accident rest with the plaintiff. Such proof must be shown by a reasonable preponderance of the evidence. A mere possibility is not sufficient. Young v. Department of Hospitals, 365 So.2d 848 (La. App. 3rd Cir. 1978), writ denied, 368 So.2d 137 (La.1979). The evidence adduced at trial established only a mere possibility that plaintiff's residual disability would hamper his future career advancement. Therefore, plaintiff did not meet his burden of proof as to his right to recover such damages, if any.
For these reasons, we find that the trial court's award to plaintiff of $40,000.00 for "Residual Disability Limiting Career Advancement" was clearly wrong and we hereby amend the judgment to exclude that element of damages. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).

DAMAGES FOR PAIN AND SUFFERING
Finally, defendant urges that the evidence was not sufficient to support the combined award to plaintiff of $80,000.00 for his past and future pain and suffering. Defendants also cite in their brief many recent cases relative to quantum in support of the contention that the trial court abused its discretion in fixing the award for pain and suffering at $80,000.00.
Although considerable discussion of plaintiff's injuries and his pain and suffering is given above, we will reiterate certain facts and summarize plaintiff's condition. On the day of the accident, October 25, 1979, plaintiff was seen in the emergency room of the Marksville General Hospital. He was complaining of pain in the left elbow and left arm. He also had multiple abrasions of *1266 the face, right buttocks, both legs and arms. Plaintiff had an abrasion and hematoma of the left arm and elbow. X-ray of the left arm and elbow were negative. Plaintiff was advised to return home and to return to the doctor's office the following Monday.
On October 28, 1979, the plaintiff was seen by Dr. Michel at his office and reported to him that he was improving. The plaintiff complained of some pain in the left rib cage. Problems in the lungs and kidneys were checked and injury in those areas was ruled out. Dr. Michel next saw plaintiff on November 5, 1979, at which time plaintiff again reported that he was doing better. The hematoma of the left forearm was decreasing. The sole complaint was of a backache over the kidney area. On November 12, 1979, plaintiff reported that everything seemed to be improved except the pain in the lower left back.
At that time Dr. Michel referred plaintiff to Dr. Seth Novoselsky. Dr. Novoselsky found no urological pathology and diagnosed plaintiff's problem as a bruise of the muscle in the left paraspinous area. Dr. Novoselsky saw plaintiff again on November 9, 1979, at which time plaintiff told him his pain had decreased. He described his sensation as a burning in the left flank when he arose in the morning and prior to taking medication. Plaintiff did not experience as much pain at that time upon motion as he had previously.
Plaintiff reported to Dr. Michel on December 17, 1979, that his condition was still improving. He did have some tenderness in the left flank and plaintiff described his pain as a burning type pain. Dr. Michel released plaintiff to return to light duty work on January 11, 1980.
Thereafter, plaintiff has had pain "off and on" but generally appears to have improved. Plaintiff was examined by Dr. L. D. Perdue in June 1980, and by Dr. Douglas L. Gamburg on March 30, 1981. Both of these experts are orthopaedic surgeons. Their findings have been indicated above.
After plaintiff had recovered from his initial injuries, Dr. Michel diagnosed plaintiff's condition as a retroperitoneal hemorrhage, a broken blood vessel which allows blood to leak out between the lining of the abdomen and the muscle in the back. Plaintiff appears to have improved continuously, but was still complaining of pain at the time of trial. The expert physicians did not make the same findings as Dr. Michel, but we have no doubt that plaintiff has suffered a painful injury and has experienced some limitation and disability. Considering all of the testimony, plaintiff's injury was a temporary injury to the muscle of his lower back which all doctors feel will eventually completely resolve itself.
Plaintiff never required hospitalization. He was given medication and conservative treatment only. After a period of limitation lasting a little over two months, plaintiff was able to return to work. He continues to improve. Plaintiff's pain and suffering, including its effect on his outlook and good humor, and his disability are not sufficient to justify an award as high as that given by the trial court. In our opinion any award beyond $25,000.00 for past pain and suffering and $5,000.00 for future pain and suffering would exceed the highest amount the trial court have justifiably awarded. Under the circumstances, and under the authority of Coco v. Winston Industries, 341 So.2d 332 (La.1976), we reduce the total award to a total of $30,000.00.
With the amendment mentioned above, the judgment of the trial court is affirmed including the judgment in favor of the intervenor, Hartford Accident and Indemnity Company.
AMENDED AND AFFIRMED AS AMENDED.
NOTES
[1] Vezinat v. Marix, 217 So.2d 416 (La.App. 1st Cir., 1968); Belson v. Subsurface Completion Service, 253 So.2d 686 (La.App. 3rd Cir. 1979); Edwards v. Lewis Grocery Company, 391 So.2d 13 (La.App. 2nd Cir. 1980); and Devillier v. Traders & General Insurance Company, 321 So.2d 55 (La.App. 3rd Cir. 1975), writ refused, 325 So.2d 273 (La.1976).
[2] Although one lay witness went so far as to state that plaintiff displayed symptoms of "battle fatigue," we note that plaintiff was back on his job in a little over two months after the accident performing productive work. Wilbert L. Bertrand, plaintiff's immediate supervisor and manager of the Marksville-Bunkie area of Entex (plaintiff's employer), was called by plaintiff. With reference to the personality change question, in response to a question by plaintiff's counsel, he testified as follows:

"Q. Did uh ... after the accident, did you make any personal observations as far as changes in his behavior or his attitude that you could observe?
A. Well, rather than the, you know, the physical, his physical ability, I knew had been affected. He seems to be nervous, maybe .. he seems to be a little more nervous now. I don't know that I, I haven't noticed anything other than him being a little nervous and highstrung and maybe a little loss of weight and you know ...
Q. That's in addition to the physical problem, I think you said?
A. Right, right." (Emphasis supplied.)